# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

**No. 19-1843V**

Filed: September 14, 2026

| | |
|---|---|
| QUANDA LUNA, | * |
| Petitioner, | * |
| v. | * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * |
| Respondent. | * |

*Courtney Christine Jorgenson*, Siri & Glimstad, LLP, Phoenix, AZ, for Petitioner.
*Benjamin Patrick Warder*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

**Shah**, Special Master:

On December 4, 2019, Quanda Luna ("Petitioner" or "Ms. Luna") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). ECF No. 1 ("Pet."). Petitioner initially alleged that she developed vaccine-induced anaphylaxis, inflammatory syndrome, and muscle weakness causing paradoxical vocal cord motion ("PVCM") as a result the influenza ("flu") vaccination she received on December 7, 2017. *Id.* at 1. Later, however, she clarified that she is alleging the

[1] Because this Decision contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

subject flu vaccination caused her to develop seronegative rheumatoid arthritis ("RA"). ECF No. 58.

For the reasons discussed in this decision, I find that Petitioner has not demonstrated that she is entitled to compensation under the Vaccine Act. Accordingly, I deny compensation.

## I. PROCEDURAL HISTORY

After filing the petition, Petitioner filed medical records and an affidavit. Exs. 1-19. On March 2, 2021, Respondent filed a Rule 4(c) Report contending that entitlement should be denied. ECF No. 32 ("Report") at 1, 21-22.

Petitioner filed an expert report and CV from David Axelrod, M.D., on May 26, 2022. Exs. 20-21. Petitioner filed the medical literature from Dr. Axelrod's expert report on June 9, 2022. Exs. 22-48. On November 8, 2022, Respondent filed an expert report from Mehrdad Matloubian, M.D., Ph.D., along with Dr. Matloubian's CV and medical literature. Ex. A, Exs. A.1-A.11, Ex. B.

On November 17, 2022, former Special Master Katherine E. Oler held a status conference in which she asked Petitioner's counsel to clarify whether Petitioner was alleging seronegative RA as her only vaccine injury. ECF No. 58. She noted that Dr. Axelrod provided a theory of causation for seronegative RA, which was not alleged as an injury in the petition. *Id.* Petitioner's counsel at the time, Mr. Andrew Downing, clarified that "Petitioner was alleging that the flu vaccine caused her to develop seronegative RA and not the other conditions listed in the petition." *Id.* Special Master Oler then informed the parties that she believed that "Petitioner's alleged injury of seronegative RA likely does not meet the ACR/EULAR diagnostic criteria because her medical records do not document that she experienced joint swelling." *Id.*

Following the status conference, Petitioner filed another expert report from Dr. Axelrod, with supporting medical literature. Exs. 49-64. Respondent filed a responsive expert report and literature from Dr. Matloubian on May 22, 2023. Ex. C, Exs. C.1-C.3.

Petitioner filed a motion for a ruling on the record on September 21, 2023. ECF No. 66 ("Motion"). Respondent filed a responsive brief on February 5, 2024, and Petitioner filed a reply brief on February 14, 2024. ECF Nos. 69 ("Response"), 70 ("Reply"). Petitioner filed updated medical records on February 15, 2024. Ex. 65.

On February 29, 2024, the parties agreed that the record was complete. ECF No. 72. On March 13, 2024, Petitioner filed Dr. Axelrod's updated CV; she filed additional medical records on August 14, 2024. Exs. 66-68. This case was reassigned to me on August 13, 2024. ECF No. 74. This matter is now ripe for adjudication.

## II. FACT EVIDENCE

### A. Medical Records

Ms. Luna was a 34-year-old library clerk at the St. Louis Public Library when she received a flu vaccination in her left deltoid on December 7, 2017. Ex. 15 at 1 ("Luna Aff."); Ex. 17 at 2-3. Prior to vaccination, her medical history was significant for a confirmed influenza A infection on March 23, 2017. Ex. 14 at 10.

The morning of her flu vaccination, December 7, 2017, Petitioner presented to her primary care physician ("PCP") Roger Guillemette, M.D., with complaints of sleep apnea and nasal congestion. Ex. 14 at 8. She was diagnosed with acute non-recurrent maxillary sinusitis and prescribed amoxicillin and Flonase. *Id.* at 9. She received the flu vaccination at Dr. Guillemette's office. Ex. 17 at 3.

Eight days after the vaccination, on December 15, 2017, Petitioner presented to the Missouri Baptist Medical Center ER for difficulty breathing. Ex. 3 at 24. She stated she had had "difficulty breathing for a week" and was "on antibiotics and steroids." *Id.* She also reported that she had experienced URI symptoms for 1.5 weeks. *Id.* at 35. She underwent several diagnostic evaluations, including a complete blood count ("CBC"), comprehensive metabolic panel ("CMP"), urinalysis, influenza test, Strep A screening, and a throat culture. *Id.* at 30-34. She had elevated white and red blood cells, but her diagnostic evaluations were otherwise normal. *Id.* Additionally, a chest x-ray showed no acute cardiopulmonary disease. *Id.* at 33-34. She was diagnosed with an upper respiratory infection ("URI") and pharyngitis and discharged with prescriptions for Toradol and Zofran. *Id.* at 35-37.

Two days later, on December 17, 2017, Petitioner was brought back to the ER by her sister, who "found her passed out in her apartment." Ex. 3 at 70. She arrived with URI symptoms, dry cough, sore throat, muscle aches, and general malaise. *Id.* at 74. Diagnostic evaluations revealed elevated white blood cells and ketones in the urine. *Id.* at 75-79. A musculoskeletal exam revealed no tenderness of the joints. *Id.* at 74. Petitioner was diagnosed with vasovagal near-syncope and pharyngitis, unspecified etiology, and discharged with instructions to follow up with her PCP. *Id.* at 81, 83.

Petitioner followed up with Dr. Guillemette on December 27, 2017. Ex. 14 at 6. She reported continued problems with sinus pressure and pain in her ears. *Id.* A review of systems revealed no reports of joint swelling or arthralgias. *Id.* Dr. Guillemette diagnosed acute non-recurrent maxillary sinusitis and prescribed doxycycline. *Id.* at 7.

Three days later, on December 30, 2017, Petitioner returned to the ER for "generalized weakness and a sensation of throat swelling." Ex. 3 at 123. She reported that onset was "[three] weeks ago" and that her symptoms became worse the night before. *Id.* She also reported chills, nasal congestion, lightheadedness, generalized weakness, bilateral ear pressure, and difficulty breathing. *Id.* She reported feeling nauseated and having diarrhea after starting doxycycline. *Id.* Her diagnostic evaluations and exams were unremarkable. *Id.* at 124-29. The ER physician, Abigail Cosgrove, M.D., was "unsure what to add to her workup," as she was "unclear" as to what

was causing Petitioner's throat tightness. *Id.* at 130. Dr. Cosgrove noted that her "suspicion for an infection" was "very low given [a] very re-assuring exam." *Id.* Dr. Cosgrove diagnosed Petitioner with generalized weakness and discharged her with instructions to follow up with her PCP. *Id*. at 130, 133.

Petitioner continued to seek care for her throat pain from various providers throughout January 2018. *See* Ex. 1 at 3-5; Ex. 12 at 3; Ex. 14 at 4-5; Ex. 18 at 7-11. She saw Dr. Guillemette on January 3, 2018, complaining of "pain in her throat and feeling like she is choking." Ex. 14 at 4. Dr. Guillemette noted that her symptoms began "after getting her flu shot" and that she had a neomycin allergy.[3] *Id.* He diagnosed globus pharyngeus,[4] prescribed lorazepam, and referred Petitioner for an ENT consultation. *Id.* at 5.

On January 10, 2018, Petitioner presented to ENT nurse practitioner Kenan Sahbaz for her sore throat. Ex. 18 at 7. Petitioner associated her sore throat and "choking like sensation" with her flu vaccination. *Id.* She reported having a neomycin allergy. *Id.* Nurse Sahbaz diagnosed vocal cord dysfunction, referred Petitioner to speech therapy, and recommended avoiding vocal cord irritants. *Id.*

On January 12, 2018, Petitioner presented to allergist Barry Zeffren, M.D. Ex. 1 at 3. The medical records from her visit with Dr. Zeffren are handwritten and not entirely legible. *Id.* Petitioner complained of shortness of breath and pain in her chest and throat. *Id.* Dr. Zeffren's assessment was not entirely legible, but it appears that he suspected a possible reaction to Neosporin and/or the flu vaccine. *Id.* at 3-4.

On January 24, 2018, Petitioner presented to a second allergist, Patrick Win, M.D., "[c]oncerned about possible adverse reaction to the flu vaccine . . . with symptoms of sore throat, muscle weakness, [and] joint pain." Ex. 12 at 3. She believed that neomycin in the vaccine was to blame. *Id.* She reported that within 24 hours of receiving the flu vaccination, she "felt bad, with symptoms of vomiting, severe throat pain, muscle weakness, joint pain, and dyspnea." *Id.* Dr. Win noted that it "is unlikely that [Petitioner's] symptoms are an IgE-mediated hypersensitivity reaction or a [delayed-type hypersensitivity] reaction to the neomycin in the influenza vaccine." *Id.* at 5. He explained that neomycin-associated reactions present with a rash rather than "generalized symptoms." *Id.* Moreover, Petitioner's recent tests were all normal. *Id.* He ordered additional laboratory testing and advised her to see a rheumatologist for her "persistent myalgia and arthralgia." *Id.* at 5-6, 8.

---

[3] Neomycin is "an aminoglycoside antibiotic complex derived from *Streptomyces fradiae,* consisting of three components designated A, B, and C. The form in clinical use is a mixture of neomycins B and C; it is effective against a wide range of aerobic gram-negative bacilli and some gram-positive bacteria." DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=33430 (last accessed on September 4, 2026).

[4] Globus pharyngeus is "an uncomfortable feeling of having a lump in the throat when none is there; it may be psychogenic *(globus hystericus)* or due to some disorder of the esophagus or nearby cervical structures." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=79000 (last accessed on September 4, 2026).

About two months after the vaccination, on February 6, 2018, Petitioner saw rheumatologist Akgun Ince, M.D., complaining of a cough, shortness of breath, fatigue, joint pain, back pain, muscle aches and pains, muscle weakness, swollen glands, and viral infection. Ex. 6 at 3. She denied joint swelling or rash. *Id*. She reported that the day after receiving the flu vaccine, she "started throwing up with throat pain," and her symptoms "never went away." *Id*. Her physical examination revealed tenderness in all of her metacarpophalangeal ("MCP") and proximal interphalangeal ("PIP") joints. *Id*. at 5. Dr. Ince noted that Petitioner "displayed significant muscle weakening and multiple trigger point tenderness" and that he was unsure of the etiology of her muscle weakness. *Id*. Dr. Ince diagnosed polyarthralgia, ordered a laboratory evaluation, started her on NSAIDs and Ultram for pain control, and recommended that she call in 10 days to discuss whether follow up was necessary. *Id.*

Throughout February and March 2018, Petitioner continued to seek medical care for her throat pain. *See* Ex. 4 at 6-15 (voice therapy records from speech pathologist Archie Harmon, Ph.D.); Ex. 8 at 27-30 (March 19, 2018, visit with otolaryngologist John F. Eisenbeis, M.D., for "evaluation of sore throat"); Ex. 16 at 25-27 (March 16, 2018 visit with nurse practitioner Leah Trower for throat pain).

On March 21, 2018, Petitioner presented to neurologist Roula Al-Dahhak, M.D., for myalgias and elevated creatine kinase ("CK"). Ex. 8 at 36. Petitioner reported that immediately after receiving the flu vaccine, she "started having trouble breathing and pain in the neck and sore throat." *Id.* As her symptoms progressed, she "had tingling and numbness in the hands and feet and aching in the neck." *Id.*; *see also id.* at 38 (listing 90-day symptoms). She denied joint pain or swelling during the previous 90 days. *Id.* at 38. Dr. Al-Dahhak noted that Petitioner's laboratory results had been normal, except for an elevated erythrocyte sedimentation rate ("ESR") of 40. *Id.* at 36. The physical exam, which included neurological and cerebellar exams, was normal. *Id.* at 39-40. Dr. Al-Dahhak's impression was that Petitioner had "non specific muscle pain and very mild elevated CK," and he also noted that there was "[n]o evidence for inflammatory myositis or muscle disease." *Id.* at 40. He recommended an EMG to assess for myopathy and prescribed Neurontin. *Id.* On April 4, 2018, Petitioner's mother called to cancel the EMG because Petitioner "was hesitant to have it done." *Id.* at 40, 59.

On May 11, 2018, Petitioner presented to neurologist David Curfman, M.D., for "exquisite neck pain" that was reported as "intermittent," along with pain and sensory symptoms in her "arms and legs at times." Ex. 19 at 4. Petitioner and her mother explained that "her issues 'must be' related to myasthenia and 'neuromuscular blockade from gentamycin.'" *Id.* at 9. Dr. Curfman noted that there was "no evidence of fatiguability" on Petitioner's exam and that her clinical history and constant symptoms would not be consistent with myasthenia gravis ("MG"). *Id.* Moreover, her prior ENT evaluation was not consistent with an MG diagnosis and was "more consistent with PVCD."[5] *Id.* Dr. Curfman concluded:

[5] Paradoxical vocal cord dysfunction describes when one's vocal cords close when intending them to open for breathing. Ashley Corrinne Davis, *Vocal Cord Dysfunction*, JOHN HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/vocal-cord-dysfunction (last accessed on September 4, 2026).

> Given her history, affect of patient and mother during exam, history of numerous doctors "without any explanation," normal examination today, and lack of unifying explanation for her disparate symptoms, I would favor psychogenic etiology to many of her symptoms as well.

*Id*. He noted that Petitioner and her mother were "frantic about finding [an] explanation" and that they were "not receptive to my reassurances about her examination and suspicions for diagnosis." *Id*. Following a "long discussion," Petitioner decided to "obtain [Acetylcholine Receptor ("AChR")] antibodies and EMG/NCS to evaluate her pain symptoms" and agreed to consider cognitive behavioral therapy if the results were negative. *Id.*

From August 7, 2018, to October 22, 2019, Petition sought treatment from Nai Shu, M.D., to try "Chinese herb medicine and other alternative treatment[s]." Ex. 7 at 3-8. During this time, she underwent laboratory testing for AChR binding antibody, AChR blocking antibody, and AChR modulating antibody, all of which were negative. *Id.* at 6-8.

On May 17, 2019, Petitioner saw dermatologist Joseph Muccini, M.D., complaining of a rash on her arms and neck that was "itchy and mild in severity." Ex. 9 at 3. She also reported having an autoimmune disorder, stating that she was "not currently on any treatment." *Id.* Dr. Muccini performed a "5mm punch biopsy" which showed a "benign skin lesion." *Id.* at 3, 6. He diagnosed Petitioner with eczematous dermatitis and consulted her regarding appropriate skin care. *Id.* at 6.

Petitioner presented to rheumatologist Steven Baak, M.D., on July 24, 2019, for "evaluation of an undiagnosed inflammatory syndrome" that was "[c]ausing issues of polyarthritis, rash, and neurologic problems" and had "not been previously diagnosed." Ex. 2 at 7. Petitioner noted that her symptoms began following her flu vaccination in December 2017, saying that she "had problems ever since." *Id.* She reported having "not done well at all with overall symptom control" and having increased pain, joint stiffness and swelling, and worsening rash. *Id.* Her physical examination revealed "tenderness to palpation" in the lumbar region and "areas of lichenification" on her wrist but was otherwise normal. *Id.* at 8-9.

Dr. Baak ordered several laboratory tests, including a CBC, a C-reactive protein ("CRP") level, a CMP, and CK, with normal results. Ex. 2 at 3-4, 8-9. Dr. Baak also ordered several antibody tests which revealed a positive result for anti-cardiolipin IgM; all other results were negative. *Id.* at 5-6. His assessment was seronegative RA of "multiple sites," "insomnia due to medical condition," and cervical pain. *Id.* at 9. He prescribed prednisone, folic acid, methotrexate sodium, and gabapentin and advised Petitioner to follow up in two months. *Id.* at 10-11. Subsequent records with other providers indicate that gabapentin was among Petitioner's current outpatient medications on October 3, 2019, and that the prednisone prescription was filled. Ex. 16 at 41; Ex. 13 at 9. There are no records indicating that she followed up or filled the other prescriptions.

On October 3, 2019, Petitioner saw neurologist Robert Margolis, M.D., for "possible myasthenia gravis." Ex. 16 at 39. She reported that she experienced "difficulty breathing" and

dizziness 24 hours after receiving the flu vaccine. *Id.* She also noted that an "ENT physician . . . told her that she had vocal cord dysfunction" that had resolved with treatment. *Id.* Petitioner's mother stated her belief that Petitioner had MG caused by an aminoglycoside[6] in the flu vaccine. *Id.* A review of systems was positive for blurred vision, shortness of breath, nausea and vomiting, joint pain and myalgia, dizziness, tremors, sensory change, and loss of consciousness. *Id.* at 42. Dr. Margolis noted that Petitioner was nervous and anxious. *Id.* He found "no evidence for neuromuscular disease in [Petitioner]." *Id.* at 43. He recommended an x-ray of the cervical spine to look for calcification of the anterior longitudinal ligament and a swallow study. *Id.* He also discussed "additional testing for myasthenia such as single fiber EMG and repetitive stim study." *Id.*

On November 27, 2019, Petitioner presented to Thomas Jamison, M.D., a functional medicine specialist, with a chief complaint of "fatigue." Ex. 13 at 8. Dr. Jamison noted that Petitioner had experienced "a wide spectrum of 'symptoms'" after her flu vaccine in December 2017 but had not been given a diagnosis. *Id.* at 11. Petitioner reported that within 24 hours of receiving the flu vaccine, she began experiencing nausea, weakness, shortness of breath, and severe throat pain. *Id.* Her current reported symptoms included deep muscular pain that would come and go with no pattern and was worse in her neck and shoulders; intermittent dizziness; tingling; an increase in "floaters" that was worse in the morning; an increase in the number and severity of food-related symptoms that did not exist prior to the vaccination; trouble concentrating and "brain fog;" and increased sensitivity to smells. *Id.* In response to a survey regarding her symptoms, Petitioner endorsed a variety of symptoms in almost every organ system. *Id.* at 13-14. She rated her stress as an 8/10 and noted that her mental health had "been severely affected by the series of events since 2017." *Id.* at 12.

During her physical exam, Petitioner was tearful and exhibited some tenderness in her neck, diffuse muscle trigger points, and a non-specific rash on her wrists and hands. Ex. 13 at 15. Dr. Jamison's assessment was a mast cell disorder. *Id.* He noted that she had a "very apparent MCAS [mast cell activation syndrome] triggered by [reaction] to flu vaccine." *Id.* He advised undergoing further testing for MCAS, but Petitioner said she could not afford it. *Id.* Dr. Jamison discussed his "concerns for not having a '[d]efinitive' [diagnosis]," but noted that clinically Petitioner had MCAS "with possible dysautonomia." *Id.* He prescribed montelukast and over-the-counter Allegra and Pepcid. *Id.*

On January 13, 2020, Petitioner followed up with Dr. Jamison. Ex. 13 at 3. She reported that she was improving with Allegra and Pepcid, but she stopped taking the montelukast after a week because it was not helping. *Id.* at 6. She also reported developing an illness a week earlier. *Id.* She said her skin rashes and swallowing were better. *Id.* Dr. Jamison diagnosed Petitioner with acute bronchitis and prescribed amoxicillin. *Id.* at 7. He also discussed ongoing treatment for mast cell disorder and recommended talking Allegra three to four times a day. *Id.*

There are no relevant medical records after January 2020.

---

[6] "[A]ny of a group of antibiotics (e.g., amikacin, gentamicin, streptomycin) derived from various bacterial species, especially those of genus Streptomyces, or produced synthetically." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=2212 (last accessed September 11, 2026).

**B. Ms. Luna's Affidavit**

Ms. Luna executed an affidavit dated July 28, 2020. Luna Aff. She stated that she made an appointment with her PCP on December 7, 2017, because she was having trouble sleeping. *Id.* at 1. She received her first flu vaccination at this visit, before beginning her work shift at the library. *Id.* That evening, after dinner, she vomited and began to feel short of breath and dizzy. *Id.* Her throat began to hurt. *Id.* This continued during the night. *Id.*

Two days later, on December 9, 2017, Petitioner woke up with difficulty breathing, dizziness, and throat pain, and she vomited again after eating. Luna Aff. at 2. She stated she vomited every day for three months thereafter. *Id.* She called in sick for work on December 10. *Id.* Finally, on December 15, 2017, she went to the ER, where she was told she had a URI and pharyngitis. *Id.* On December 17, 2017, she passed out in her bathroom and went back to the ER. *Id.* She was told she had experienced syncope. *Id.*

Ms. Luna continued to feel throat pain and a sensation of swelling, as well as weakness, trouble swallowing, and shortness of breath, through the end of December 2017. Luna Aff. at 2. She was unable to fully participate in Christmas activities or work full time. *Id.* at 3. She then learned the flu vaccination she received contained Neosporin, to which she was allergic. *Id.* at 3-4. Her mother contacted the vaccine manufacturer and was advised the flu vaccine actually contained gentamicin, a different antibiotic in the same class as Neosporin. *Id.* Petitioner saw an allergist, who confirmed she still had a slight allergy to neomycin, an ingredient in Neosporin. *Id.* at 4.

In August 2018, Ms. Luna saw a Chinese medicine doctor for her throat pain. Luna Aff. at 5. She was prescribed herbal medicines and supplements, which provided partial relief. *Id.* She testified her swallowing has improved, "but I must be careful not to do too much." *Id.* She sees Dr. Jamison at Palm Health every six weeks, at a significant cost. *Id.* at 6.

## III. EXPERT EVIDENCE

**A. David Axelrod, M.D.: First Expert Report**

Dr. Axelrod submitted two reports in this case. Ex. 20 ("First Axelrod Rep."); Ex. 49 ("Second Axelrod Rep."). He earned his M.D. from the University of Michigan Medical School in 1974 and is board certified in internal medicine, adult rheumatology, and allergy and immunology. He trained at McGill University and the Nations Institutes of Health. Ex. 66 ("Axelrod Updated CV") at 1; First Axelrod Rep. at 1. He is a clinical immunologist. First Axelrod Rep. at 1. Although he is currently retired from patient care, as a clinician Dr. Axelrod was "involved with the diagnosis and treatment of individuals with drugs reactions (including to vaccines)." First Axelrod Rep. at 1. Before retiring, Dr. Axelrod held several academic appointments, most recently as the interim director for the Division of Allergy, Immunology, and Rheumatology at the University of Medicine and Dentistry of New Jersey, from 2009-2010. Axelrod Updated CV at 2. He was also appointed to several visiting academic positions, most

recently at Penn State Hershey Medical Center from 2013-2022. *Id.* He has published 12 academic articles and co-authored abstracts for an additional 15 articles. Axelrod Updated CV at 3-4.

Dr. Axelrod explained:

> [RA] is an autoimmune disease that may result in destruction of synovial joints, with resultant severe disability and premature mortality. Joint damage is rarely apparent in the early stages of the disease and the classification criteria tend to accumulate over time.

*Id.* He reviewed the 2010 Classification Criteria for RA ("2010 criteria"), jointly developed by the American College of Rheumatology ("ACR") and European League Against Rheumatism ("EULAR"), which provide scores for classifying RA and "can also provide a guideline for the diagnosis of [RA]." First Axelrod Rep. at 5 (citing Katherine P. Liao, *Classification and Epidemiology of Rheumatoid Arthritis*, *in* RHEUMATOLOGY 747, 747-48 (Marc C. Hochberg et al. eds., 7th ed. 2019) (Ex. 23) ("*Liao*")). He explained that "[a]lthough individuals with a score of < 6/10 are not classifiable as having definite [RA], their status can be reassessed[,] and the criteria might be fulfilled cumulatively over time." *Id.* at 6. Moreover, while the criteria state that an RA diagnosis involves "at least [one] joint with definite clinical synovitis (swelling)," they also clarify that "joint involvement refers to any **swollen OR tender** joint on examination." *Id.* (emphasis in original). Thus, the criteria assume that "any joint with **swelling OR tenderness** on examination is indicative of active synovitis [(swelling)]." *Id.* (emphasis in original).

Dr. Axelrod opined that Petitioner had seronegative RA caused by her December 7, 2017 flu vaccination. First Axelrod Rep. at 17. He noted that on February 6, 2018, Petitioner presented to rheumatologist Dr. Ince with joint pain that began the day after vaccination. First Axelrod Rep. at 6. On exam, she had tenderness in her MCP and PIP joints, but her test for rheumatoid factor ("RF") was negative. *Id.* She had an elevated ESR score. *Id.* at 7. Likewise, on July 24, 2019, rheumatologist Dr. Baak noted that Petitioner had worsening joint pain, stiffness, and swelling. *Id.* at 6-7. Petitioner's symptoms, which appeared to have lasted more than six weeks, gave her an ACR/EULAR score of 7, "which fits a diagnosis of definite [RA]." *Id.* at 7. Still, Petitioner continued to test negative for both RF and anti-citrullinated peptide antibodies ("ACPA"), making her case seronegative. *Id.*

Dr. Axelrod discussed another condition, inflammatory arthritis caused by immune checkpoint inhibitors ("ICIs"), a common form of cancer immunotherapy. First Axelrod Rep. at 7-8 (citing Laura C. Cappelli et al., *Autoimmune Complications of Immune Checkpoint Inhibitors for Cancer*, *in* FIRESTEIN & KELLY'S TEXTBOOK OF RHEUMATOLOGY 2189, 2191-92 (Gary S. Firestein et al. eds.,11th ed. 2020) (Ex. 24) ("*Firestein*")). ICIs "target inhibitory receptors and ligands on T-cells and antigen presenting cells." *Id.* at 7. ICIs can cause side effects, including Immune-Related Adverse Events ("IRAEs"), which are "related to excessive or off-target inflammation that causes non-tumor tissue damage." *Id.* Moreover, "[r]heumatologic [IRAEs] can present similar to many classic rheumatologic diseases, with important differences in clinical phenotype and auto-antibodies." *Id.* at 8. Inflammatory arthritis is one of the most common adverse effects of ICIs. *Id.* at 8. Inflammatory arthritis can present somewhat differently from

classic RA, and patients often will be seronegative for RF and ACPA. *Id.* Molecular mimicry is one proposed mechanism by which IRAEs can be caused by ICIs. *Id.*

Dr. Axelrod proposed that, like ICIs, the flu vaccine can cause inflammatory side-effects, including seronegative RA, via molecular mimicry. First Axelrod Rep. at 8, 11. The *Kanduc* and *Trost* studies broadly showed that bacteria and viruses like influenza share peptides with human peptides. *Id.* at 8 (citing Darja Kanduc et al., *Massive Peptide Sharing Between Viral and Human Proteomes*, 29 PEPTIDES 1755 (2008) (Ex. 25) ("*Kandu*"); Brett Trost et al., *Bacterial Peptides Are Intensively Present Throughout the Human Proteome*, 1 SELF NONSELF 71 (2010) (Ex. 25) ("*Trost*")). Therefore, it would not be surprising to find shared sequences between the targets of ICIs, human immune checkpoints, and influenza hemagglutinin, which is in the vaccine. *Id.* Dr. Axelrod acknowledged, however, that

> given the frequent exposure to infectious and noninfectious viruses and bacteria, it is clear that other factors must be involved in the development of Seronegative [RA]. It is likely that we are not aware of all the predisposing factors for the development of an autoimmune synovitis.

*Id.*

There are "at least 2 components" of molecular mimicry: (1) "amino acid sequence similarity" and (2) "host susceptibility to develop autoimmune disease." First Axelrod Rep. at 9. Evidence shows that "similar or homologous amino acid sequences on self-antigens" can activate T-cells and cause inflammatory dysfunction and/or damage. *Id.* (citing Abul K. Abbas, Andrew H. Lichtman & Shiv Pillai, *Antigen Presentation to T Lymphocytes and the Functions of Major Histocompatibility Complex Molecules*, *in* CELLULAR & MOLECULAR IMMUNOLOGY 117 (9th ed. 2018) (Ex. 27) ("*Abbas*"); Andrea J. Sant, *Overview of T-Cell Recognition: Making Pathogens Visible to the Immune System*, *in* CLINICAL IMMUNOLOGY: PRINCIPLES & PRACTICES 93 (Robert R. Rich et al. eds., 5th ed. 2019) (Ex. 28) ("*Sant*"); J. Lindsay Whitton et al., *Molecular Analyses of a Five-Amino-Acid Cytotoxic T-Lymphocyte (CTL) Epitope: An Immunodominant Region Which Induces Nonreciprocal CTL Cross-Reactivity*, 63 J. VIROL. 4303 (1989) (Ex. 29) ("*Whitton*"); Bernhard Hemmer et al., *Minimal Peptide Length Requirements for CD4 + T Cell Clones-Implications for Molecular Mimicry and T Cell Survival*, 12 INT'L IMMUNOL. 375 (2000) (Ex. 30) ("*Hemmer*")). Importantly, "amino acid similarity, not identity, is a predictive measure of cross-reactivity." *Id.* (citing Sune Frankild et al., *Amino Acid Similarity Accounts for T Cell Cross-Reactivity and for "Holes" in the T Cell Repertoire*, 3 PLOS ONE, March 19, 2008, at 1 (Ex. 31) ("*Frankild*")).

Dr. Axelrod used a protein database to compare the number of shared sequences of "homologous/conserved amino acids" between the human immune checkpoint "CTLA-4" and the strains of Influenza A and B he predicted would have been present in the vaccine Petitioner received. First Axelrod Rep. at 10-11. He concluded:

> [T]he influenza hemagglutinins share sufficient similar amino acid sequences to activate immune checkpoint reactive immune cells, to

> result in antibodies that inhibit the immune checkpoints, just as the immune checkpoint inhibitors used as immunotherapy for the treatment of malignancy. The result could manifest as the immune related adverse events expected from immune checkpoint inhibition, perhaps in a susceptible host ([Petitioner]).

*Id.* at 11.

Regarding *Althen* prong II, Dr. Axelrod opined that the homologous amino acid sequences he identified would have been sufficient to "activate immune cells that are capable of producing antibodies" in Petitioner's immune checkpoints and cause "expected immune related adverse events, including seronegative inflammatory arthritis." First Axelrod Rep. at 11. He further noted that Petitioner was diagnosed with sinusitis on December 7, 2017, the same day as the vaccination, and with a possible URI eight days later. *Id.* The first report of joint inflammation was not until February 6, 2018, "about 1.5 - 2 months following her prior infection diagnoses." *Id.* He explained that a primary adaptive immune response to the infections would have occurred "within 25 days"; a secondary adaptive immune response would have occurred within 3-5 days. *Id.* at 11-12. Based on the sequence of events, he did not believe Petitioner's arthritis could have been caused by an immune reaction to the infections. *Id.* at 12.

Dr. Axelrod addressed *Althen* prong III in two alternative parts, discussing the timing for "primary" and "secondary" adaptive immune responses. First Axelrod Rep. at 12, 14. He opined that a "secondary" adaptive immune response to a booster dose of the flu vaccine would likely occur within a few days. *Id*. at 12-14 (citing John J. Miller, Jr. et al., *The Speed of the Secondary Immune Response to Tetanus Toxoid with a Review of WAR Reports and Observations on Simultaneous Injection of Toxoid and Antitoxin*, 3 PEDIATRICS 64 (1949) (Ex. 33) ("*Miller*"); Asia Wyatt & Doron Levy, *Modeling the Effect of Memory in the Adaptive Immune Response*, 82 BULL. MATH. BIOL. 124 (2020) (Ex. 34); *Abbas*. A primary adaptive immune response to an initial dose of the vaccine would occur over a longer period. *Id.* at 14-15 (citing Thomas J. Lawley et al., *A Prospective Clinical and Immunologic Analysis of Patients with Serum Sickness*, 311 NEJM 1407 (1984) (Ex. 35) ("*Lawley*"); Rakiba Belkhir et al., *Rheumatoid Arthritis and Polymyalgia Rheumatica Occurring After Immune Checkpoint Inhibitor Treatment*, 76 ANNALS RHEUM. DIS. 1747 (2017) (Ex. 36) ("*Belkhir*"); Kristina Bruder-Bakhaya et al., *Characterization of Arthralgia Induced by PD-1 Antibody Treatment in Patients with Metastasized Cutaneous Malignancies*, 67 CANCER IMMUNOL. IMMUNOTHER. 175 (2018) (Ex. 36) ("*Bruder-Bakhaya*"); C. Calabrese et al., *Rheumatic Immune-Related Adverse Events of Checkpoint Therapy for Cancer: Case Series of a New Nosological Entity*, 3 RMD OPEN 1 (2017) (Ex. 39) ("*Calabrese*"); *see also* Exs. 40-48 (expounding on immune checkpoint inhibiter-induced inflammatory arthritis and other arthritis research).

The onset of Petitioner's inflammatory arthritis was about two months after vaccination. First Axelrod Rep. at 16. If she developed a secondary adaptive immune response, her antibody response may have peaked the week after vaccination and "would have allowed a time interval of at least 1.75 months to develop her inflammatory arthropathy." *Id.* Had she developed a primary immune response, her symptoms "her symptoms would have developed within 25 days" of vaccination and "allowed a time interval of at least 1.25 months to develop her inflammatory

arthropathy." *Id.* Although the interval between vaccination and the onset of her symptoms was "rather wide," Dr. Axelrod opined that the onset of Petitioner's symptoms "fits" within the appropriate time interval. *Id.*

**B. Mehrdad Matloubian, M.D., Ph.D.: First Expert Report**

Dr. Matloubian submitted two reports in this case. Ex. A ("First Matloubian Rep."); Ex. C ("Second Matloubian Rep."). Dr. Matloubian is a Professor of Medicine at UC San Francisco. First Matloubian Rep. at 1, 17. He earned his M.D. and Ph.D. in virology from UCLA in 1996. *Id.*; Ex. B. ("Matloubian CV") at 1. He is board certified in internal medicine and rheumatology. Matloubian CV at 1-2. His expertise includes T and B cell responses. First Matloubian Rep. at 1. He has published more than 40 peer-reviewed articles and has received 10 research awards. Matloubian CV at 8-14. He "routinely evaluate[s] individuals with musculoskeletal symptoms," and he diagnoses and treats "rheumatoid arthritis as well as immune checkpoint inhibitor associated inflammatory arthritis and other autoimmune diseases." First Matloubian Rep. at 1.

Dr. Matloubian concluded it is likely Petitioner "did not suffer from any injuries" due to her flu vaccination, including seronegative RA. First Matloubian Rep. at 17. She did not have joint swelling, a critical criterion for RA, and she was never treated for seronegative RA. *Id.* at 16. Moreover, Dr. Axelrod's "use of sequence homologies to allege molecular mimicry and T cell cross-reactivity is fundamentally flawed," and he did not provide evidence to support a conclusion that any of the proposed homologous sequences were immunogenic. *Id.* at 16-17. The medical literature does not provide evidence of "the development of autoantibodies to immune checkpoint proteins as a consequence of immunization or infection." *Id.* at 17.

Dr. Matloubian explained that RA is "a systemic inflammatory disease whose major manifestation is peripheral arthritis, mainly in the small joints of the hands and feet." First Matloubian Rep. at 12 (citing James R. O'Dell & John B. Imboden, *Rheumatoid Arthritis*, *in* CURRENT DIAGNOSIS & TREATMENT: RHEUMATOLOGY 139 (3d ed. 2013) (Ex. A.5) ("*O'Dell*")). RA is quite common, with women affected 2-3 times more often than men. *Id.* It is a diagnosis of exclusion, meaning that other diagnoses must first be ruled out before RA is assigned. *Id.* (citing *O'Dell*). These include: (1) other systemic rheumatic diseases, such as lupus, reactive arthritis, inflammatory bowel disease-associated arthritis, psoriatic arthritis, etc.; (2) viral polyarthritis associated with parvovirus B19, rubella, hepatitis B and C viruses, and alphaviruses (not influenza virus); and (3) other diseases such as Lyme, septic arthritis, and crystal induced arthritis (gout and pseudogout). *Id.* "In addition, one must also consider other conditions such as osteoarthritis and fibromyalgia, which can cause joint pain (arthralgia) without any frank inflammation or arthritis." *Id.*

Furthermore,

> "While a history of arthralgias [joint pain] is important, **the diagnosis of RA requires the objective evidence of joint inflammation (swelling or warmth or both) on examination. . . .**"

> "[T]he classification criteria can be applied to any patient or otherwise healthy individual, as long as [two] mandatory requirements are met: first, there must be evidence of currently active clinical synovitis (i.e. swelling) in at least [one] joint as determined by an expert assessor. . . . [C]urrently no methods other than clinical examination should be used to evaluate the presence of synovitis in the determination of eligibility . . . ."

*Id.* (quoting *O'Dell* at 144; Daniel Aletaha et al., *2010 Rheumatoid Arthritis Classification Criteria*, 62 ARTHRITIS RHEUM. 2569, 2575 (2010) (Ex. A.6) ("*Aletaha*")) (emphasis added by Dr. Matloubian). If there is no evidence of "joint swelling or synovitis" on a physical examination, the criteria for classifying RA "**cannot** be applied." *Id.* (emphasis in original).

On February 6, 2018, Petitioner was first evaluated by rheumatologist Dr. Ince, during which he noted that she had tenderness in many of the small joints of her hands. First Matloubian Rep. at 12 (citing Ex. 6 at 5). Dr. Ince assessed polyarthralgia, meaning pain in multiple joints. *Id.* Notably, Petitioner denied joint swelling, and Dr. Ince did not observe any such swelling. *Id.* Dr. Ince did not diagnose RA. *Id.* Dr. Matloubian opined that because Petitioner did not have any swollen joints on exam, she did not meet the eligibility criteria for RA, and the classification criteria "cannot be applied to her." *Id.* He explained:

> [Dr. Axelrod] erroneously states that the joint involvement in the criteria can refer to any swollen or tender joints on examination. In fact, **total joint involvement is assessed only after a patient meets the entry criteria of having at least one swollen joint on physical exam. . . .**
>
> Dr. Axelrod attempts to bypass the eligibility criteria, and erroneously relies on the number of tender joints in [P]etitioner's fingers that were observed during her appointment with Dr. Ince, as support for a diagnosis of RA.

*Id.* at 12-13 (emphasis in original).

Dr. Baak, another rheumatologist, evaluated Petitioner on July 24, 2019 and also "did not find any swollen joints on physical [examination]." First Matloubian Rep. at 13 (citing Ex. 2 at 9). Petitioner also denied prolonged morning stiffness, "a hallmark of an inflammatory arthritis." *Id.* Although Dr. Baak assessed RA, that diagnosis was unfounded, as Petitioner "did not have any evidence of joint swelling" or other characteristics of RA. *Id.* Similarly, Petitioner was seen by several other physicians, none of whom observed joint swelling. *Id.* (citing Ex. 8 at 39; Ex. 10 at 8). Petitioner never received treatment for RA, further pulling against the diagnosis. *Id.*

Dr. Matloubian also addressed Petitioner's ESR levels, which were "mildly elevated on two occasions." First Matloubian Rep. at 13. ESR elevations are "non-specific" and can be found in obese individuals. *Id.* *Cohen* found that "[i]nflammatory markers are significantly higher in subjects with abnormal compared to normal BMI," with a greater difference in women than in men. *Id.* (quoting Eytan Cohen et al., *Markers of Chronic Inflammation in Overweight and Obese Individuals and the Role of Gender: A Cross-Sectional Study of a Large Cohort*, 14 J. INFLAMM. RSCH. 567 (2021) (Ex. A.7) ("*Cohen*")). Petitioner's BMI was elevated, in the range of 38-40, and

consistent with obesity; her CRP was also normal, and she did not have anemia or increased platelets, all of which are associated with RA. *Id.* (citing *O'Dell* at 142).

Turning to *Althen* prong one, Dr. Matloubian opined that the sequence homologies identified by Dr. Axelrod are "meaningless from an immunologic perspective as there is no way to reliably state that any of these sequences would be presented by any MHC/HLA[7] molecule in general, and more specifically to petitioner's T cells, and be immunogenic." First Matloubian Rep. at 15. Short amino acid homologies between two proteins are "quite common, especially since all proteins are made up of just 20 amino acids." *Id.* at 14. Moreover, for molecular mimicry to be a credible hypothesis for vaccine causation, it should first be shown that the associated natural infection can lead to the development of the claimed autoimmune disease. *Id.* (citing Noel R Rose, *Negative Selection, Epitope Mimicry and Autoimmunity*, 49 CURR. OP. IMMUNOL. 51 (2017) (Ex. A.8) ("*Rose*")). Medical literature has not recognized flu infection as a cause of RA. *Id.* As such, it is "exceedingly unlikely" that molecular mimicry leads to flu vaccine-induced RA. *Id.*

Dr. Matloubian explained that the key flaw in Dr. Axelrod's sequence homology approach "is that there is no way to predict which peptides are likely, or even capable of being presented by any MHC/HLA molecule and seen by any T cell, including [P]etitioner's." First Matloubian Rep. at 14. This is because MHC/HLA molecules are highly polymorphic, and "each individual's different MHC/HLA molecule determines what peptides are presented to T cells." *Id.* (referencing *Abbas*). It is estimated that there are over 10,000 MHC/HLA alleles in humans. *Id.*

Dr. Matloubian characterized Dr. Axelrod's theory of cross-reaction between human immune checkpoint molecules and flu hemagglutinin as "highly speculative" and not supported by the literature. First Matloubian Rep. at 15. The articles Dr. Axelrod cited "describe and discuss rheumatologic immune-related adverse events that may occur as a consequence of therapeutic administration of immune checkpoint inhibitors to treat cancers." *Id.* The literature does not describe the development of autoimmune arthritis via autoantibodies to immune checkpoint molecules produced in response to infection or immunization. *Id.* (referencing Exs. 24, 36-48).

Furthermore, flu vaccines have not been associated with the development or exacerbation of RA. First Matloubian Rep. at 15. *Bengtsson* found that "vaccinations neither increased the risk of RA overall nor the risk of two major subgroups of RA [CCP positive or negative]," and they also did not increase the risk in two groups with established risk factors for RA: smokers and carriers of HLA-DRB1 alleles. *Id.* (quoting and citing Camilla Bengtsson et al., *Common Vaccinations Among Adults Do Not Increase the Risk of Developing Rheumatoid Arthritis: Results From the Swedish EIRA Study*, 69 ANN. RHEUM. DIS. 1831 (2010) (Ex. A.9) ("*Bengtsson*")). Similarly, *Westra* comprehensively reviewed the literature and found no reported significant influence of vaccination on RA disease activity. *Id.* (citing Johanna Westra et al., *Vaccination of Patients with Autoimmune Inflammatory Rheumatic Diseases*, 11 NATURE REV. RHEUMATOL. 135 (2015) (Ex. A.10) ("*Westra*")). The American College of Rheumatology recommends that

---

[7] MHC: major histocompatibility complex. DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=66341 (last accessed September 10, 2026).

HLA: human leukocyte antigens. DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=56923.

individuals with autoimmune diseases, including RA, receive the flu vaccine. *Id.* (citing Jasvinder A. Singh et al., *2015 American College of Rheumatology Guideline for the Treatment of Rheumatoid Arthritis*, 68 ARTHRITIS CARE RSCH. 1 (2015) (Ex. A.11) ("*Singh*")). Collectively, the literature shows that "even in people who have clinical RA, . . . exposure to influenza agents does not lead to worsening of their disease." *Id.*

On *Althen* prong two, Dr. Matloubian noted that although Dr. Axelrod acknowledged Petitioner was diagnosed with an infection on December 7, 2017, he dismissed the possibility of the infection causing her RA. First Matloubian Rep. at 16. Dr. Matloubian opined that Dr. Axelrod's reasoning could be applied to support a conclusion that the flu vaccination did not cause Petitioner's RA. *Id.* He said: "It appears that Dr. Axelrod has two different theories for how an infection or immunization can lead to RA and is applying them differently to rationalize different outcomes." *Id.*

On *Althen* prong three, Dr. Matloubian opined that the medical literature does not support Dr. Axelrod's proposed timeframe. First Matloubian Rep. at 16. None of the studies Dr. Axelrod cited "show that an individual can develop antibodies to checkpoint molecules as a consequence of an infection or immunization and then subsequently[] develop an autoimmune inflammatory arthritis." *Id.* (referencing Exs. 36-48). Because Dr. Axelrod's proposed mechanism was unsupported and speculative, Dr. Matloubian could not address the appropriate timing for it. *Id.*

**C. Dr. Axelrod: Second Expert Report**

Dr. Axelrod disputed Dr. Matloubian's conclusion that Petitioner failed to meet the criteria for seronegative RA. Second Axelrod Rep. at 2. He maintained that the 2010 criteria were not meant to be dispositive diagnostic criteria; instead, they were designed to identify potential candidates for clinical trials on various RA treatments. *Id.* at 1 (citing *Aletaha*). The criteria were "not developed to identify less severe [RA cases]." *Id.* at 2. The authors of the criteria stressed that joint tenderness and swelling are equally important for assessing "joint involvement" in classifying RA. *Id.* Furthermore, RA is not a static disease, and the symptoms might present cumulatively over time, allowing for changes in classification. *Id.*

Dr. Axelrod cited literature stating that the 2010 criteria were not meant for "use in clinical practice." Second Axelrod Rep. at 3 (citing and quoting Vivian P. Bykerk & Elena M. Massarotti, *The New ACR/EULAR Classification Criteria for RA: How Are the New Criteria Performing in the Clinic?*, 51 RHEUMATOLOGY vi10 (2012) (Ex. 52) ("*Bykerk*")). *Bykerk* cautioned that the criteria were not sensitive or specific enough to capture rare RA presentations, which could result in underdiagnosis of RA. *Id.* Similarly, *Gera* published classification criteria ("*Gera* criteria") for seronegative RA geared toward identifying appropriate clinical trial subjects. *Id.* (citing Chanchal Gera & Arti Muley, *Classification Criteria for Seronegative Rheumatoid Arthritis Based on Rheumatologist's Practice and Experience*, 19 CURR. MED. ISSUES 236 (2021) ("*Gera*")). The *Gera* criteria required documented swelling of five or more joints on examination, elevated ESR or CRP, and negative serology for RF and ACPA. *Id.* Dr. Axelrod questioned the reliability of these criteria because they were developed using a small group of patients. *Id.*

Dr. Axelrod concluded that it was unsurprising Petitioner's case would not meet the criteria outlined in these papers, "even if she suffered Rheumatoid Arthritis." Second Axelrod Rep. at 4.

Additionally, obese patients are at higher risk for RA. Second Axelrod Rep. at 4 (citing J. Goossens et al., *Overweight and Obesity Affect Clinical Assessment of Synovitis in Rheumatoid Arthritis: Comparison of Ultrasonography and Clinical Exam*, 37 CLIN. EXP. RHEUMATOL. 49 (2019) (Ex. 54) ("*Goossens*")). However, *Goossens* showed that joint swelling was significantly more difficult to detect in obese patients by physical examination than by ultrasound. *Id.* Thus, since Petitioner was clinically obese, it is not surprising that her treating physicians did not appreciate and document joint swelling. *Id.* She did have a pattern of joint tenderness that matched what is seen in RA, including tenderness of the PIP and MCP joints. *Id.* (citing Richard D. Brasington, Jr. & Jonathan J. Miner, *Clinical Features of Rheumatoid Arthritis*, *in* RHEUMATOLOGY 760 (Marc C. Hochberg et al. eds., 7th ed. 2019) (Ex. 55) ("*Hochberg*")). Also, her ESR levels were consistent with RA, because they exceeded what would be seen in a healthy obese person. *Id.* at 5 (citing *Cohen*).

Dr. Axelrod disagreed with Dr. Matloubian's suggestion that "infection must cause disease for a vaccine to cause disease." Second Axelrod Rep. at 6-7. Autoimmune reactions are rare, making it hard to establish an association with vaccines or infections. *Id.* He also disputed the proposition that each individual will have different T-cell responses depending on the peptide presented by the individual's MHC molecules. *Id.* at 9 (citing *Abbas*). Rather, the enzymes processing the proteins are the same among individuals and function at the same sites on the same proteins, such as flu hemagglutinin. *Id.* "Therefore, the distribution of peptides presented by an individual's MCH is the same, from one person to another." *Id.*

On timing, Dr. Axelrod argued that the two-month interval between Petitioner's diagnosed infections and the development of RA was too long for any type of adaptive immune response. Second Axelrod Rep. at 10. However, "given the available evidence regarding the time interval for the development of seronegative Rheumatoid Arthritis following exposure to [ICIs], the time interval of [two] months is consistent with the currently available evidence." *Id.*

**D. Dr. Matloubian: Second Expert Report**

Dr. Matloubian pointed out that Dr. Axelrod changed his reliance on the 2010 criteria for RA, now contending that they "are not perfect and should not be relied upon." Second Matloubian Rep. at 1. He did not, however, offer an alternative set of criteria. *Id.* Furthermore, Dr. Axelrod's suggestion that an RA diagnosis can be made based on a pattern of joint tenderness alone "can lead to misdiagnosis, since individuals with joint tenderness due to other causes, such as osteoarthritis or fibromyalgia[,] can be mistakenly labeled as having RA in the absence of joint swelling . . . ." *Id.* at 1-2. This is why the textbook chapter on RA requires objective evidence of joint swelling, warmth, or both before the diagnosis can be made. *Id.* at 2.

Dr. Matloubian disputed Dr. Axelrod's position that the finding of joint tenderness in Petitioner's MCP and PIP joints by Dr. Ince was sufficient to diagnose RA. Second Matloubian Rep. at 2. This ignores that Petitioner herself denied having any joint swelling at that visit. *Id.* Also, Petitioner tested positive for trigger points, which was suggestive of a condition like

fibromyalgia, not RA. *Id.* Fibromyalgia is a common mimic of RA and is distinguished in part by the absence of joint swelling, warmth, or diminished range of motion. *Id.* (citing Joshua F Baker, *Diagnosis and Differential Diagnosis of Rheumatoid Arthritis*, UPTODATE, https://www.uptodate.com/contents/diagnosis-and-differential-diagnosis-of-rheumatoid-arthritis#disclaimerContent (last accessed September 11, 2026) (Ex. C.1) ("*Baker*")). Petitioner also denied morning stiffness in her joints, lowering the probability she had RA. *Id.*

Although Dr. Baak diagnosed RA, his findings contradicted that diagnosis. Second Matloubian Rep. at 2. Along with denying morning stiffness, Petitioner denied tenderness of the MCP or PIP joints at that visit, and Dr. Baak documented that her hands had a "normal appearance." *Id.*

Also, "untreated RA tends to be a chronic condition rather than an intermittent one, with affected individuals having persistent pain and swelling in the small joints of their hands and feet." Second Matloubian Rep. at 3. But even though Petitioner's "RA" was untreated, she was seen over time by multiple physicians and never observed to have any joint swelling. *Id.*

On causation, Dr. Matloubian pointed out that none of the target proteins identified by Dr. Axelrod have been shown to be associated with the natural development of RA. Second Matloubian Rep. at 3. He reiterated that sequence homologies among proteins are very common and not in themselves indicative of cross-reaction or pathogenicity. *Id.* Individuals will have different MHC molecules, meaning that different peptide sequences will be presented in different people, further lessening the chance that a particular sequence homology will be cross-reactive in a particular person. *Id.* at 3-4 (citing Abul K. Abbas et al., *Antigen Presentation to T Lymphocytes and the Functions of Major Histocompatibility Complex Molecules*, *in* IMMUNOBIOLOGY: THE IMMUNE SYSTEM IN HEALTH AND DISEASE 117 (5th ed. 2001) (Ex. 62) ("IMMUNOBIOLOGY")). Dr. Axelrod's methodology of identifying similarities among peptide sequences was therefore "irrelevant from an immunologic perspective." *Id.* at 4.

Dr. Matloubian also disputed the notion that similarities in amino acid sequences are sufficient to demonstrate molecular mimicry. Second Matloubian Rep. at 4. There is evidence that "**altering just one single amino acid out of eight dramatically reduces the ability of the peptide to activate T cells.**" *Id.* at 4-5 (citing and reproducing Figure 1 from Mark A. Daniels et al., *Thymic Selection Threshold Defined by Compartmentalization of Ras/MAPK Signalling*, 444 Nature 724 (Ex. C.3) ("*Daniels*")) (emphasis in original).

Dr. Matloubian again stressed: "If an infectious disease is NOT associated with a specific autoimmune disease, then it is unlikely that a vaccine containing the same antigens as the infectious agent would lead to the disease through molecular mimicry." Second Matloubian Rep. at 5. Flu infection is not associated with RA, nor is RA a disease that generally occurs after any acute infection. *Id.*

## IV. APPLICABLE LAW

### A. Petitioner's Burden in Vaccine Program Cases

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, he may show that he suffered a Table injury within the time provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Table, he may demonstrate that he suffered an "off-Table" injury that was caused-in-fact by his vaccination. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 13(a)(1). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). The petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or the opinion of a competent physician. § 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Secretary of Health and Human Services*. 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires a petitioner to establish by preponderant evidence that the vaccination caused his injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278.

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, a petitioner must provide a "reputable medical theory" demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs*., 35 F.3d 543, 548 (Fed. Cir. 1994) (citations omitted). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548-49; *Bunting v. Sec'y of Health & Hum. Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991).

A petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing

*Capizzano*, 440 F.3d at 1325-26). Despite their expertise, special masters are not empowered by statute to conclusively resolve what are complex scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. However, this does not negate or reduce a petitioner's ultimate burden to establish his entitlement to compensation by preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326 (stating that "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the existence of medical records and/or statements of treating physician views does not require the special master to adopt their conclusions *per se*. § 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct–that it must be accepted in its entirety and cannot be rebutted."). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs*., 100 Fed. Cl. 742, 749 (2011) (finding that it was not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Health & Hum. Servs*., No. 06-522V, 2011 WL 1935813 at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically acceptable temporal relationship." *Id.* Thus, a petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer [causation]." *de Bazan v. Sec'y of Health & Hum. Servs*., 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also be consistent with the theory for how the relevant vaccine can cause the alleged injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs*., 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs*., No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

**B. Law Governing Analysis of Fact Evidence**

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. §11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." §13(b)(1). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F. 3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is based on a rational analysis).

Medical records created contemporaneously with the events they describe are generally trustworthy, because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions," where "accuracy has an extra premium." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (quoting *Cucuras*, 993 F.2d at 1528). Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *See Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475 at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony, especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony could be more persuasive than written medical records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, the special master should assess each witness's credibility when determining the weight their testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical

professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In deciding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, a rational analysis must be explicated. *Burns*, 3 F.3d at 417.

**C. Analysis of Expert Testimony**

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592-95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do in other federal judicial proceedings. Those factors are employed by judges to exclude evidence that is unreliable and potentially confusing to a jury. In Vaccine Program cases, these factors are generally used to assess the reliability and weight of scientific evidence. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted . . . ."). The flexible use of the *Daubert* factors to evaluate persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 743.

Respondent frequently offers one or more experts of his own to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis special masters must employ in Vaccine Program cases. *Id.* at 1325-26 ("Assessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("[T]his court has unambiguously explained that special masters are

expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### D. Consideration of Medical Literature

Finally, although this decision discusses some but not all the medical literature in detail, I have reviewed and considered all the medical records and literature submitted in this matter. *See Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

### E. Determination to Resolve Case without a Hearing

The Vaccine Act and Rules contemplate and encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d); *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (affirming on appeal). Regardless of the preferences of the parties, hearings are not required in every matter. *Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing).

## V. ANALYSIS

The parties dispute both Petitioner's diagnosis and whether her alleged injury, seronegative RA, was caused-in-fact by her December 7, 2017 flu vaccination. As a threshold matter, a petitioner must establish that she suffered the injury for which she seeks compensation. *Broekelschen*, 618 F.3d at 1345-46. "The function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner]'s injury.'" *Andreu*, 569 F.3d at 1382 (quoting *Knudsen*, 35 F.3d at 549). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Hum. Servs*., 118 Fed. Cl. 47, 56 (2014) (quoting 42.U.S.C. § 300aa-11(c)). Accordingly, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what injury, if any, [is] supported by the evidence presented in the record" before applying a causation analysis pursuant to *Althen*. *Lombardi v. Sec'y of Health & Hum. Servs*., 656 F.3d 1343, 1351-53 (Fed. Cir. 2011).

As discussed below, I conclude that there is not preponderant evidence in favor of the diagnosis alleged. As a result, Petitioner is not entitled to compensation, and I need not resolve the question of vaccine causation.

### A. Rheumatoid Arthritis

RA is an inflammatory disease of the joints. *See* First Matloubian Rep. at 12; *see also Aletaha* at 2570 ("RA is a chronic inflammatory disease characterized by joint swelling, joint tenderness, and destruction of synovial joints . . . ."). Its primary characteristic is peripheral arthritis, mainly in the small joints of the hands and feet. First Matloubian Rep. at 12. It is more common in women than men. *Id.* It can lead to substantial disability and even premature mortality. *Aletaha* at 2570. Treatment for RA typically includes the use of disease-modifying antirheumatic drugs ("DMARDs"), most notably methotrexate. *Id.* at 2571 (noting that the optimal use of these treatments has "dramatically enhanced the success of RA management"). Seronegative RA, distinguished by negative serology for RF and ACPA, is thought to be clinically and pathogenetically distinct from seropositive disease. *Id.* at 2578 (seropositive and seronegative patients "have been shown to differ from a pathogenetic, clinical, and prognostic perspective").

The record before me includes multiple articles submitted by the parties detailing RA classification criteria. The 2010 criteria applied to all forms of RA, while the *Gera* criteria applied to seronegative RA only. The 2010 criteria were developed by a joint ACR/EULAR working group. *Aletaha* at 2569-70. Those criteria replaced the 1987 ACR criteria, which provided a "benchmark for disease definition, but [had] a significant limitation in that they were derived by trying to discriminate patients with established RA from those with a combination of other definite rheumatologic diagnoses." *Aletaha* at 2571. As a result, the 1987 criteria did not adequately capture patients who could benefit from early intervention for RA. *Id.* The 2010 criteria aimed to broaden the patient population that could be described as having RA for purposes of identifying potential candidates for intervention. *Id.* at 2570 ("The work focused on identifying, among patients newly presenting with undifferentiated inflammatory synovitis, factors that best discriminated between those who were and those who were not at high risk for persistent and/or erosive disease").

Importantly, the 2010 criteria mandated a definitive finding of synovitis as a threshold for even classifying a case of "RA." The *Aletaha* authors explained:

> The classification criteria can be applied to any patient or otherwise healthy individual, ***as long as 2 mandatory requirements are met: first, there must be evidence of currently active clinical synovitis (i.e., swelling) in at least 1 joint as determined by an expert assessor (Table 3)***. All joints of a full joint count may be assessed for this purpose with the exception of the distal interphalangeal (DIP) joints, the first metatarsophalangeal (MTP) joint, and the first carpometacarpal (CMC) joint, since these joints are typically involved in osteoarthritis. Although currently no methods other than clinical examination should be used to evaluate the presence of synovitis in this determination of eligibility, this may change in the future as validated imaging techniques become more widely available. Second, the criteria may be applied only to those patients in whom the observed synovitis is not better explained by another diagnosis (Table 3). For example, conditions that should be

> considered and excluded include systemic lupus erythematosus, psoriatic arthritis, and gout, among others.

*Aletaha* at 2575 (emphasis added). The authors further clarified: "It is important . . . to stress that the criteria are meant to be applied only to eligible patients, in whom the presence of obvious *clinical* synovitis in at least 1 joint is central. They should not be applied to patients with mere arthralgia or to normal subjects." *Id.* at 2577.

If a patient meets these threshold requirements, the 2010 criteria can be applied. *Id.* The criteria broadly assess joint involvement, serology, acute-phase reactant results, and duration of symptoms. *Aletaha* at 2574 (Table 3). A score of at least 6/10 is required to be classified as having "definite" RA; this classification may be assigned if the criteria are "fulfilled cumulatively over time." *Id.*

The 2010 criteria authors noted that the criteria were deliberately labeled as "classification criteria," not "diagnostic criteria," and were geared toward identifying patients for clinical trials. *Aletaha* at 2579. However, the authors recognized the criteria were likely to be used for diagnostic purposes, though physician judgment at the clinical level was still critical, as the characteristics of individual patients might not fit the criteria precisely. *Id.*

Dr. Axelrod also cited the *Gera* paper, which attempted to provide classification criteria for seronegative RA specifically. The authors acknowledged that the diagnosis of seronegative RA "remains difficult because chronic synovitis is a nonspecific feature and can be seen in a large number of diseases . . . ." *Gera* at 236. The *Gera* criteria were created because the 2010 criteria relied heavily on serology and therefore might not adequately capture seronegative patients. *Id.* at 236-37. The authors proposed that the following *mandatory* signs should be present to classify a possible case of seronegative RA: (1) documented joint swelling of five or more joints on examination; (2) raised ESR and/or raised CRP; and (3) negative RF and ACPA. *Id.* at 239.

**B. The evidence did not preponderantly establish Petitioner had seronegative RA.**

Petitioner received the subject flu vaccination on December 7, 2017. Ex. 17 at 2-3. She went to the ER eight days later, on December 15, 2017, complaining of difficulty breathing for the past week and URI symptoms for 1.5 weeks. Ex. 3 at 24, 35. She did not complain of any symptoms in her joints and denied joint pain. *Id.* at 28. She was diagnosed with a URI and pharyngitis. *Id.* at 35-37.

Between December 17, 2017 and January 23, 2018, Petitioner went back to the ER several times and also saw multiple providers on an outpatient basis. At no time did she complain of any joint swelling or pain, nor was any joint swelling, redness, warmth, or tenderness observed on exam. *See* Ex. 3 at 74 (December 17, 2017 ER visit finding no tenderness of the joints on exam); Ex. 14 at 6 (December 27, 2017 visit with PCP Dr. Guillemette at which Petitioner did not complain of any joint swelling or arthralgias); Ex. 3 at 123 (December 30, 2017 ER visit at which Petitioner denied joint pain); Ex. 14 at 4 (January 3, 2018 visit with Dr. Guillemette at which Petitioner denied joint swelling or arthralgias); Ex. 18 at 8-9 (January 10, 2018 visit with ENT at which Petitioner denied joint swelling).

The first time Petitioner mentioned joint symptoms to any physician was on January 24, 2018, when she saw allergist Dr. Win. Ex. 12 at 3. She reported that within 24 hours of receiving her flu vaccination, she experienced a number of symptoms, including nonspecific "joint pain." *Id.* Dr. Win did not examine her joints but referred her to a rheumatologist. *Id.* at 6. On February 6, 2018, she saw rheumatologist Dr. Ince, complaining of joint pain but denying joint swelling. Ex. 6 at 3-4. On exam, she exhibited tenderness in her MCP and PIP joints, but no swelling was observed. *Id.* at 5. Dr. Ince also observed multiple trigger points with tenderness. *Id.* He diagnosed polyarthralgia, ordered lab work, and prescribed NSAIDs and Ultram. *Id.* When Petitioner saw neurologist Dr. Al-Dahhak on March 21, 2018, she denied having joint pain or swelling during the previous 90 days. Ex. 8 at 38.

On July 24, 2019, Petitioner saw a second rheumatologist, Dr. Baak, for an "undiagnosed inflammatory syndrome" that was causing polyarthralgias and other symptoms. Ex. 2 at 7. At that visit, she complained of an increase in joint stiffness and swelling. *Id.* Dr. Baak did not document any joint swelling or tenderness, however, aside from tenderness to palpation in the lumbar region. *Id.* at 8-9. He noted her hands had a "normal appearance." *Id.* at 9. Nonetheless, he diagnosed seronegative RA of "multiple sites," without describing the sites affected. *Id.*

On October 3, 2019, Petitioner saw neurologist Dr. Margolis, fearing she had myasthenia gravis. Ex. 16 at 39. At that visit, she endorsed joint pain, but it does not appear Dr. Margolis examined her joints. *See id.* at 42. On November 27, 2019, she saw Dr. Jamison, a functional medicine specialist, and again endorsed joint pain, along with stiffness. Ex. 13 at 7. Dr. Jamison performed an examination but did not document any joint swelling. *See id.*

Overall, the evidence clearly demonstrated that Petitioner was not observed by any healthcare provider to have swelling in any joint. She complained of joint swelling only once: when she saw Dr. Baak on July 24, 2019. Notably, that complaint was not corroborated on exam by Dr. Baak. She complained of joint pain on several occasions, and she exhibited tenderness to palpation of the MCP and PIP joints on one occasion, when she saw Dr. Ince in February 2018. Again, however, Dr. Ince did not observe any swelling of those joints. Instead, he observed multiple trigger points. As Dr. Matloubian explained, the combination of joint pain and trigger points was suggestive of fibromyalgia or a similar chronic pain syndrome, not RA. Second Matloubian Rep. at 2. Tellingly, even Petitioner *herself* did not describe experiencing any post-vaccination joint swelling or pain in her affidavit. Instead, her affidavit focused primarily on her throat symptoms. *See* Luna Aff.

Because Petitioner never had any documented synovitis, her case would not even qualify for classification under either the 2010 criteria or the *Gera* criteria. Furthermore, even putting aside that these criteria were developed largely to help identify clinical trial candidates, Dr. Matloubian was persuasive in explaining that, in practice, joint swelling is a prerequisite to a diagnosis of RA. Second Matloubian Rep. at 1-2; *O'Dell* at 144 ("While a history of arthralgias is important, the diagnosis of RA requires the objective evidence of joint inflammation (swelling or warmth or both) on examination."). Merely finding joint tenderness is insufficient because other conditions, like fibromyalgia, also present with joint tenderness. Second Matloubian Rep.

at 2. The distinguishing characteristic of RA is the objective evidence of synovitis. Dr. Axelrod offered no alternative diagnostic criteria or literature stating otherwise.[8]

Dr. Axelrod proposed that Petitioner's physicians might have missed swelling in her finger joints due to her obesity. He cited the *Goossens* study, which found that ultrasound was a more reliable method for identifying synovitis than clinical examination in obese patients. Second Axelrod Rep. at 4; *Goossens* at 52. However, given that Petitioner saw numerous providers and underwent multiple exams, including by two different rheumatologists, this seems unlikely. It is particularly notable that Dr. Ince specifically examined the MCP and PIP joints, which are commonly involved in RA, and found tenderness but documented *no* swelling. Moreover, Petitioner's complaints of joint symptoms were quite sporadic, decreasing the likelihood that she was experiencing true synovitis. For example, she reported joint pain to Dr. Ince in February 2018, but one month later, she denied joint symptoms for the previous 90 days during her visit with neurologist Dr. Al-Dahhak. Petitioner's own affidavit did not describe any joint symptoms. These facts undermine the theory that Petitioner had joint swelling that went undetected.

Petitioner's case was uncharacteristic of seronegative RA in other respects as well. Dr. Matloubian persuasively noted that she never underwent any treatment for RA, though methotrexate was prescribed by Dr. Baak. First Matloubian Rep. at 13. Despite being untreated, her condition did not worsen, which would not align with the expected course of RA. *See O'Dell* at 139 ("The natural history of the disease is one of progressive joint damage and deformity, and, in a sizeable minority, the development of extra-articular manifestations."). She also did not complain of morning stiffness, a prominent feature of RA. *Id.* at 4.

Petitioner's ESR level was elevated. As Dr. Matloubian explained, ESR is nonspecific and also is frequently elevated in obese patients. First Matloubian Rep. at 13. Other markers, including the lack of anemia, normal CRP, and normal platelet levels, were inconsistent with RA. *Id.*; *see also O'Dell* at 142. Dr. Axelrod countered that Petitioner's ESR level exceeded what would be expected in an obese patient with a similar BMI. Second Axelrod Rep. at 5; *see Cohen* at 569 tbl. 2 (reporting the mean ESR in patients with varying BMI ranges). Still, given the absence of joint swelling and other signifiers of RA, Petitioner's ESR level does not change the calculus in favor of the alleged diagnosis.

---

[8] As discussed above, Dr. Axelrod argued that because the 2010 criteria defined "joint involvement" to encompass either swelling or tenderness of a joint, the threshold requirement of "synovitis" similarly entailed the observation of either swelling *or* tenderness in a joint. First Axelrod Rep. at 6. This interpretation is at odds with the plain words of the criteria authors: "Joint involvement, as used for the determination of pattern of joint distribution, differs from the definition of synovitis in [one] joint needed for eligibility in the eligibility criteria." *Aletaha* at 2576; *see also id.* at 2575 (a mandatory requirement for applying the criteria is "evidence of currently active clinical synovitis [(*i.e., swelling*)] in at least [one] joint as determined by an expert assessor[.]" (emphasis added)). Furthermore, Dr. Matloubian persuasively countered that, in practice, it would be erroneous to base an RA diagnosis on joint tenderness without synovitis, as tenderness can occur with several other conditions. Second Matloubian Rep. at 1-2.

Lastly, Dr. Baak diagnosed Petitioner with seronegative RA, even though he did not document any joint swelling. I am not bound to accept Dr. Baak's diagnosis, and, as discussed, the overall record did not support his assessment. *See* §13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court").

Thus, I conclude the evidence does not preponderantly support the alleged diagnosis, seronegative RA. As such, Petitioner is not entitled to compensation, and it is unnecessary for me to resolve whether the evidence satisfies the *Althen* prongs for vaccine causation.[9] *See Lombardi*, 656 F.3d at 1351-53.

## VI. CONCLUSION

Upon careful evaluation of all the evidence submitted in this matter, including the medical records, affidavit, expert opinions, and medical literature, I conclude that Petitioner has not shown by preponderant evidence that she is entitled to compensation under the Vaccine Act. I therefore deny entitlement to compensation. **The clerk shall enter judgment accordingly.**[10]

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master

[9] Although I find it unnecessary to resolve causation, it is noteworthy that cases involving seronegative RA have been uniformly disfavored in the Vaccine Program. *See, e.g.*, *Monge-Landry v. Sec'y of Health & Hum. Servs.*, No. 14-853V, 2026 WL 2042486, at *1 (Fed. Cl. Spec. Mstr. June 9, 2026) (finding that petitioner failed to prove that the flu vaccine can cause seronegative RA); *Alqulissi v. Sec'y of Health & Hum. Servs.*, No. 22-1511V, 2026 WL 989615, at *1-3 (Fed. Cl. Spec. Mstr. Mar. 16, 2026) (denying compensation to petitioner claiming flu vaccine caused his seronegative RA and noting that "seronegative RA is enigmatic"); *Maxwell v. Sec'y of Health & Hum. Servs.*, No. 17-1367, 2025 WL 1291642 (Fed. Cl. Spec. Mstr. Mar. 26, 2025) (denying compensation to petitioner claiming that flu vaccine caused or aggravated his inflammatory polyarthropathy and/or seronegative RA); *Seivwright v. Sec'y of Health & Hum. Servs.*, No. 19-1398V, 2023 WL 3197267, at *1 (Fed. Cl. Spec. Mstr. May 2, 2023) (granting petitioner's motion to voluntarily dismiss her claim that a flu vaccination caused her to develop seronegative RA); *Tullio v. Sec'y of Health & Hum. Servs.*, No. 15-51V, 2019 WL 7580149, at *1 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), *aff'd*, 149 Fed. Cl. 448 (2020) (finding that petitioner had failed to preponderantly prove that pathogenic molecular mimicry between the flu vaccine and collagen could cause seronegative RA); *C.P. v. Sec'y of Health & Human Servs.*, No. 14-917V, 2019 WL 5483621, at *1 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (rejecting a causation theory of seronegative RA based on molecular mimicry between an unknown tissue and the flu vaccine).

[10] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.